503 S.E.2d 731

**In the Matter of Richard C. BELL, Respondent.**

**No. 24817.**

Supreme Court of South Carolina.

Heard June 3, 1998.

Decided July 20, 1998.

Attorney General Charles M. Condon and Senior Assistant Attorney General Nathan Kaminski, Jr., Columbia, for complainant.

Desa A. Ballard, West Columbia, for respondent.

PER CURIAM:

In this attorney grievance matter, Richard C. Bell ("Respondent") is charged with engaging in misconduct in violation

of various provisions of the Rules of Professional Conduct, Rule 407, SCACR, and the Rules for Lawyer Disciplinary Enforcement, Rule 413, SCACR.

## FACTS

Respondent's alleged misconduct relates to two separate matters:

### 1. *Forgery/Property Tax Matter*

In 1989–90, Respondent, through Mulberry Properties, Inc., acquired the sole ownership interest in a condominium real estate venture known as Mulberry Place, located in Charleston County. The development loan and subsequent financing for the real estate venture were provided by Newberry Federal Savings Bank ("Bank"). While Mulberry Place had been in development, a previous developer had contested the 1989 tax assessment on the property. In June 1990, Respondent pursued this dispute with the Charleston County Tax Assessor's Office.

In October 1990, Bank extended a loan to Respondent in the principal sum of $165,000. The purpose of this loan, as indicated in the commitment letter, was to make necessary repairs to the project, to make current the 1988 and 1989 property taxes (which had not been paid), and to maintain funds to use for mortgage payments until the occupancy rate was raised.

A mortgage, dated October 31, 1990, from Mulberry Properties, Inc. was executed by Respondent to secure the $165,000 loan. On the same date, the closing attorney issued an opinion letter stating that Bank had "valid first, second and third mortgages on the property and their liens are paramount except for 1988 and 1989 property taxes which are past due and 1990 taxes which are a lien, though not yet due and payable, and all taxes subsequent thereto." Based on this title opinion, Bank obtained copies of the property tax execution notices and calculated the total amount of 1988 and 1989 taxes to be $31,656.

On or about November 9, 1990, Bank issued to Respondent a check in the amount of $31,656 from the $165,000 loan amount. The check was made payable to Respondent and to

J. Al Cannon, Jr., Charleston County Sheriff, who was the delinquent tax collector. This check represented the exact amount due on the 1988 and 1989 taxes. The voucher slip attached to the check stated that it was payment for the 1988 and 1989 delinquent taxes on Mulberry Place, Inc.

Respondent received the check. He signed his own name and also signed on the back of the check the name of Sheriff Cannon. This was done without the sheriff's knowledge, permission, or consent. Respondent deposited this check into the Mulberry Place operating account at Lowcountry Savings Bank ("Lowcountry Bank"). Respondent did not pay any of the Mulberry Property taxes, nor did he notify Bank of his failure to do so.

Respondent's check stubs for the Lowcountry Bank Mulberry Place operating account show a check number 136, dated November 13, 1990, issued to "J. Al Cannon, Jr., County Sheriff, Mulberry Taxes," in the amount of $31,656. Check number 136 was not received or processed by the Delinquent Tax Department of the Charleston County Sheriff's Office. Respondent claimed that he took the check to the tax office and tried to pay the 1990 taxes instead of the 1988–89 taxes; however, officials would not accept the payment. The check never cleared through Respondent's Lowcountry Bank Mulberry Place operating account. Respondent testified that he returned check number 136 to the checkbook, but it was subsequently misplaced. However, the check stub was never marked "void," and the check stubs continued to reflect a balance as if the $31,656 check had cleared the account, although the monthly bank statements showed that it had not.[1]

In December 1990, Respondent asked that a portion of the funds comprising the $165,000 loan not yet disbursed by Bank be applied to the November mortgage payments then due for the Mulberry project. Respondent agreed that he would be responsible for financing the pending repairs to the project apartment units and would complete them. On December 6, 1990, Respondent signed a document, which stated in part,

---

1. On or about January 1991, a couple offered to sell Respondent their residence located in Charleston County if Respondent could make a $25,000 down payment and close on the house in thirty days. Respondent used $24,000 of the funds in the Lowcountry Bank Mulberry Place operating account to make this down payment on the residence.

"According to our original agreement, funds were used to pay all accounts current and any pending property taxes due."

Because the Mulberry Place property taxes were not paid, the property was sold for taxes in 1992. Later in the year, Respondent's attempts to reduce the taxes on the 1989 assessment were finally successful. The Tax Assessor reduced the 1989 taxes by over $28,000. On March 8, 1993, Respondent advised Bank that the Mulberry Place property had been sold for taxes and had to be redeemed no later than July 1993. A Vice President at Bank contacted Respondent on or about April 12, 1993 and asked him why the Charleston County tax collector had never received Bank's 1990 check. On May 7, 1993, Respondent informed Bank that he had taken care of the 1989 delinquent taxes for Mulberry, but he could not pay any other delinquent taxes. Bank sent a check to the Charleston County tax collector in the amount of $75,961 to pay the 1988, 1990, and 1991 property taxes due. Title to all of the apartment units owned by Mulberry Properties, Inc. was conveyed by Respondent to Bank on February 7, 1994 in consideration of the cancellation of the notes and mortgages due to Bank.

Respondent was indicted in 1995 by the Charleston County Grand Jury for forgery of Sheriff Cannon's name on the Bank check. Respondent applied for and was accepted into a Pretrial Intervention Program under the supervision of the Ninth Circuit Solicitor's Office. Respondent completed the Program and made restitution to Bank in the amount of $31,656.

### 2. *Martin Matter*

Donna Martin, a resident of Utah, desired to adopt a child. She sent her information to a South Carolina adoption specialist, who forwarded the information to five South Carolina attorneys specializing in adoptions. Respondent was one of these attorneys. This information found its way into the files of A Loving Choice Adoption Agency ("Adoption Agency"). Adoption Agency was operated by Respondent's wife, Mrs. Deborah Bell. Respondent and Adoption Agency shared office space, a receptionist, a bookkeeper, secretarial help, and, at one time, even a common phone number. Respondent and Mrs. Bell testified that Respondent represented Adoption

Agency as its attorney. Mrs. Bell stated that when there are legal questions to be answered, they are referred to Respondent. Adoption Agency, however, does not pay Respondent any regular fee or retainer for his services. His fee, when he provides legal services to an adopting parent, is billed separately from the agency fee, directly to the adopting parent.

Mrs. Bell contacted Ms. Martin about an adoption opportunity. Ms. Martin testified that she agreed to pay $3000 to Adoption Agency to cover such expenses as counseling, food, lodging, and medical costs. Ms. Martin called Respondent to follow through with the adoption. She claimed that she spoke with Respondent a few times before the birth of the child being considered for adoption. Ms. Martin believed that Respondent was representing her in the adoption.

Respondent filed a petition in March 1995 in the family court. This petition was accompanied by an affidavit signed by the birth mother. The affidavit stated in part: ". . . I am a resident of the State of South Carolina and I have selected an Adoptive Parent from the State of Utah, who is represented by Richard C. Bell, Esquire, whom I believe to be a suitable and qualified adopting parent for this child." Respondent stated that the document was prepared by Adoption Agency staff, and he filed it without closely reviewing it.

A few weeks later, the birth mother gave birth to the child being considered for adoption. Ms. Martin testified that she called Respondent, and Respondent arranged to obtain the necessary consent forms for adoption before Ms. Martin undertook the expense of traveling to South Carolina. In late March 1995, Respondent obtained the birth mother's signature on the consent forms. One form contained a statement that Respondent did not represent the prospective adoptive parent, Ms. Martin.[2]

---

2. Respondent testified that he believed that Ms. Martin would finalize the adoption in Utah. This testimony was contrary to his written response to the Board of Commissioners; in that response, he stated that Ms. Martin was not sure whether she would proceed with the adoption in South Carolina or Utah, and if she had determined to finalize in South Carolina, then Respondent would not have ultimately taken the mother's consents, but would have had another attorney to obtain them. The hearing Panel concluded that this provided evidence that Respondent did engage in discussions with Ms. Martin about

Ms. Martin took a flight to South Carolina and met Respondent and the birth mother at the airport. Ms. Martin delivered a check to Respondent for $3,365, payable to Adoption Agency. Respondent presented to Ms. Martin a legal risk document stating that the father of the child had not given consent. Ms. Martin signed this document.

The next day the birth mother changed her mind about giving up her child for adoption. Ms. Martin called Respondent's office to obtain advice about how to handle the situation, but he was not available. Ms. Martin decided to return to Utah. She was unsuccessful in completing the adoption. In April 1995, she wrote Respondent, indicating she was terminating his representation and demanding reimbursement of funds paid to Adoption Agency. Respondent replied and returned a large portion of the fee Ms. Martin had paid to Adoption Agency.

The Panel found that Respondent's involvement in the adoption process, as well as the advice and document preparation that he provided, formed a basis upon which Ms. Martin reasonably believed that Respondent was representing her interest in this matter. Respondent did not clearly explain to Ms. Martin whose interests he was representing. She reasonably believed that Respondent failed to disclose actual or potential conflicts of interest and that she had not been properly represented. The Panel found that Respondent was representing multiple clients with adverse interests. Because of his failure to recognize Ms. Martin as his client, he did not provide competent representation.

## DISCUSSION

The hearing Panel's report, which discusses the above facts, was adopted by the full Panel. Respondent did not file any exceptions to the full Panel's adoption of the report. After examining the facts, we find that Respondent's misconduct has been proven by clear and convincing evidence, and this misconduct violates the following: *Rule 407*, SCACR: Rule 8.4(b) (criminal acts that reflect adversely on lawyer's honesty, trustworthiness or fitness as a lawyer in other respects); Rule

---

adoption finalization, which would necessarily have involved legal issues.

8.4(c) (conduct involving moral turpitude); Rule 8.4(d) (conduct involving dishonesty, fraud, deceit or misrepresentation); Rule 8.4(e) (conduct that is prejudicial to the administration of justice); Rule 1.1 (lawyer shall provide competent representation to a client); Rule 1.7(b) (lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person); Rule 2.2 (conditions under which common representation is permissible); *Rule 413*, SCACR: Rule 7(a)(5) (conduct tending to pollute the administration of justice).

Since Respondent does not contest the facts of this case, nor the rule violations, the central issue before us is the sanction to be imposed. We have treated very seriously attorney misconduct in matters involving the forging of signatures, as well as misrepresentation and deceit. *See In re T. Aladdin Mozingo*, 330 S.C. 67, 497 S.E.2d 729 (1998) (Court accepted disbarment of attorney whose misconduct included tracing of a Supreme Court justice's signature on a purported family court order); *State v. Belcher*, 249 S.C. 301, 153 S.E.2d 921 (1967) (attorney disbarred for forging special referee and circuit judge's names); *In re Timothy Walker*, 305 S.C. 482, 409 S.E.2d 412 (1991) (attorney indefinitely suspended for forging circuit judge's signature); *In re Marlene Sipes*, 297 S.C. 531, 377 S.E.2d 574 (1989) (attorney suspended for one year where she signed her husband's name to checks, without his permission, and used Girl Scout funds for her personal purposes); *In re George Lyall*, 328 S.C. 121, 492 S.E.2d 99 (1997) (attorney suspended for nine months where his misconduct included forging wife's signature on a check for a trust and using funds for personal purposes).

In addition, we have sanctioned attorneys for representing conflicting interests or not clarifying whom they represent. *See In re Julian Morgan*, 288 S.C. 401, 343 S.E.2d 29 (1986) (attorney publicly reprimanded for representing clients with conflicting interests); *In re William Pyatt*, 280 S.C. 302, 312 S.E.2d 553 (1984) (attorney publicly reprimanded where he failed to exercise proper care and judgment in explaining to clients that he did not represent their legal interests).

We note that Respondent has previously been disciplined. In 1986, Respondent was publicly reprimanded for taking

control of a check issued to a client's wife, who was an adversary to client in impending domestic litigation, and for assuming control of her money in violation of a foreclosure order. Two members of this Court dissented from the decision to impose a public reprimand on Respondent, concluding rather that he should be suspended for one year. *See In re Richard C. Bell,* 289 S.C. 290, 345 S.E.2d 475 (1986).

The hearing Panel recommended a definite suspension of six months. The full Panel adopted this recommendation. We find Respondent's misconduct warrants a nine month suspension. Within fifteen days of the date of this opinion, Respondent shall file an affidavit with the Clerk of Court showing he has complied with Rule 30 of Rule 413, SCACR.

**DEFINITE SUSPENSION.**